UNITED STATES of America,
Plaintiff–Appellant,

v.

Tomasita EYLICIO–MONTOYA,
Defendant–Appellee.

No. 93–2076.

United States Court of Appeals,
Tenth Circuit.

March 1, 1994.

Joseph Douglas Wilson, Attorney, Department of Justice, Washington, D.C. (Don J. Svet, United States Attorney, and Tara C. Neda, Assistant United States Attorney, District of New Mexico, with him on the brief), for Plaintiff-Appellant.

Stephen P. McCue, Assistant Federal Public Defender, Albuquerque, New Mexico, for Defendant-Appellee.

Before EBEL and McKAY, Circuit Judges, and SAFFELS,* Senior District Judge.

McKAY, Circuit Judge.

This is an interlocutory appeal by the United States from an order of the district court suppressing evidence in a criminal case. Interlocutory appeal is authorized under 18 U.S.C. § 3731. Ms. Montoya was charged with possession with intent to distribute less than fifty kilograms of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D). Ms. Montoya moved to suppress evidence of the marijuana found in the car in which she was riding. The district court granted the Motion to Suppress and the government appeals.

At the suppression hearing, United States Customs Agent Albert Vogrinec testified that in October 1992 he received a call from an informant with whom he had previously communicated, and who had provided reliable, substantiated information in the past. The informant stated that a woman named "Tammy" had been hired by a man named "Ruben" to transport one hundred pounds of marijuana from Grants, New Mexico to Denver, Colorado. The informant provided Agent Vogrinec with Tammy's address, although he or she did not know Tammy's last name. Agent Vogrinec testified that the informant told him that the information had come from Tammy herself. After checking on the address provided by the informant, Agent Vogrinec discovered that Ms. Tomasita Eylicio–Montoya lived at that residence. Agent Vogrinec testified that he was already familiar with Ms. Montoya, who had been arrested at least twice, and convicted at least once, for transporting marijuana.

Agent Vogrinec testified that, on October 31, 1992, the informant called again and told him that "Ruben" had arrived in Albuquerque from Mexico, and that the trip would take place within the next few days. The informant again telephoned on November 2, and said that the trip would begin on that day. The Customs Service then began surveillance of Ms. Montoya's residence. At that time, the agents conducting the surveillance observed a white Ford pickup truck with a Mexican license plate in front of Ms. Montoya's house. A license check revealed that the vehicle had entered the United States on October 31, which corresponded with the date the informant had indicated that "Ruben" had crossed the border from Mexico.

The Customs agents next observed a brown Datsun 210, which had also been described by the informant, arrive at the Montoya residence. Ms. Montoya and a man

* Honorable Dale E. Saffels, United States Senior District Judge for the District of Kansas, sitting by designation.

later identified as Ruben Rez removed the "drive-out sticker" from the brown Datsun and replaced it with a New Mexico license plate; this plate was traced to a white 1982 Mazda. Ms. Montoya and a woman later identified as Ms. Montoya's daughter-in-law left in the brown Datsun at the same time that the white pickup truck departed with two males, one of whom was later identified as Ruben Rez.

Agent Vogrinec testified that the two vehicles proceeded to a nearby gas station, where they were met by another male, later identified as Ms. Montoya's son, Joseph. They then departed and traveled to Grants, stopping at the Best Western Motel, where Ms. Montoya registered. In the early morning of November 3, two cars arrived at the motel and parked next to the pickup truck and the Datsun. During the early morning, the pickup truck and the Datsun left the motel several times. At six o'clock that morning, Ms. Montoya left the motel and walked to a nearby restaurant with several people not previously seen with her. Some time later the agents observed Ms. Montoya, her son, and her daughter-in-law get into a blue Dodge Colt hatchback. Ms. Montoya's son drove, Ms. Montoya was in the front passenger seat, and her daughter-in-law was in the rear seat. Ruben Rez and another hispanic male got into the pickup truck. Both vehicles left the motel and proceeded west on Interstate 40.[1]

After following the two vehicles for a short distance, Agent Vogrinec requested police assistance in stopping the cars. Both cars were stopped, and Agent Vogrinec and a New Mexico police officer approached the blue Dodge with their firearms unholstered, although Agent Vogrinec testified that he kept his weapon behind his back. Agent Vogrinec further stated that, as he approached the vehicle, he observed through the hatchback window a large bundle of burlap bags, partially covered by a towel. He then asked the occupants of the blue Dodge, including Ms. Montoya, to exit the vehicle. The three occupants were ordered to lie on

the ground, because there were no female officers present to conduct a pat-down search for weapons. Agent Vogrinec then obtained the keys from the ignition, opened the hatchback, and cut open the taped and cellophane-wrapped contents of the burlap bag, confirming that it contained marijuana. At that time, Agent Vogrinec informed Ms. Montoya, her son, and her daughter-in-law that they were under arrest. Agent Vogrinec testified that Joseph Eylicio told him that the car belonged to his father, Ms. Montoya's ex-husband.

At the conclusion of the suppression hearing, the district court made the following oral findings of fact and conclusions of law:[2]

That Agent Vogrinec received a call from an informant indicating the defendant had informed the informant that the defendant and a Ruben would be transporting marijuana from Grants to Denver.

Apparently there was a surveillance at 803 Third Street, Southwest, at which the agents observed a white Ford pickup truck with a Chihuahua, Mexico, license plate, as well as [a] brown Datsun–210 that had previously been identified by the informant. And that vehicle was also parked at the same residence.

That then they observed a blue Dodge Colt also arrive at the same residence, after which then the pickup as well as the Dodge Colt departed from the residence and went to I–40 and proceeded in the direction of Grants.

That they later observed these two vehicles proceed to a parking lot at the Best Western Motel in Grants, where these two vehicles and the defendant and other occupants—or at least the defendant registered and at least was in a room at the Best Western Motel.

That then the agents observed the cars—or at least the pickup truck and the Dodge Colt to depart from the motel and proceeded westbound on I–40 from Grants. That Agent Vogrinec followed the two vehicles

---

1. Defense counsel pointed out at the suppression hearing and at oral argument that this is inconsistent with a trip from Grants to Denver, as the most direct route would be to go east on I–40.

2. The district court made no written findings of fact and conclusions of law.

and then ordered the state police to stop the automobiles.

Agent Vogrinec also had information that the defendant previously had been involved in a drug investigation in 1990. This is the totality of the circumstances that the agents had at the time the vehicle was stopped.

The vehicle presumably was observing all the traffic regulations. The agent has not testified there was any conduct on the part of the occupants of the car that would warrant a stop, other than the fact that he suspected that they were transporting marijuana.

Yet there's no evidence before the Court that they observed any movement of any bundles or anything else from any of the vehicles to this particular car or anything from the automobile, or from the room to the car.

The Court finds that at the time that the car was stopped, apparently the agents directed the defendants to lie on the ground. He further states that it was rather severe weather, and I find that all of the defendants were arrested at the[ ] time that they were directed to exit the car and lie on the ground.

And the Court finds that there was absolutely nothing to justify the belief that there was probable cause that a crime was being committed.

And I further find that there was no evidence to warrant neither the stop nor the arrest, and I find that they were arrested immediately upon their being ordered to exit the car.

After they were forced to lie on the ground, the agents got the keys and then opened the trunk, and the Court finds that there also was no probable cause for that particular search.

(R.Vol. II at 29–31.) The court then granted Ms. Montoya's Motion to Suppress.

■ In reviewing the granting of a motion to suppress evidence in a criminal case, we apply the clearly erroneous standard to the district court's factual findings and we view the evidence in the light most favorable to the ruling. *United States v. Anderson,* 981 F.2d 1560, 1566 (10th Cir.1992). The ultimate conclusion of the reasonableness of a search and seizure under the Fourth Amendment, however, is a conclusion of law that we review de novo. *Id.*

As a preliminary matter, we must decide whether the district court applied the correct legal standard in determining the constitutionality of the stopping of the vehicle in which Ms. Montoya was riding. It is not absolutely clear from the district court's findings of fact and conclusions of law whether that court applied a reasonable suspicion or a probable cause standard to the stopping of the vehicle. The government argues on appeal that the stop was an investigatory stop for which only reasonable suspicion is required, and that this standard was met.

It has long been settled that "stopping an automobile and detaining its occupants constitute[s] a 'seizure' within the meaning of [the Fourth] Amendment." *Berkemer v. McCarty,* 468 U.S. 420, 436–37, 104 S.Ct. 3138, 3148, 82 L.Ed.2d 317 (1984) (quoting *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979)). However, a brief investigative stop only requires "some objective manifestation that the person stopped is ... engaged in criminal activity." *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). This standard requires that in light of the totality of the circumstances, the officers must have a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* at 417–18, 101 S.Ct. at 695. This threshold is lower than that required for a more intrusive detention, and need not rise to the level of probable cause for an arrest; only reasonable suspicion is necessary. *See United States v. Brignoni–Ponce,* 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580–81, 45 L.Ed.2d 607 (1975); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

■ The district court in this case found that the arrest occurred the moment the occupants of the vehicle were ordered from the car. Therefore, if the district court found that since no probable cause for the stop had been shown, the stop was improper, this was error. If, on the other hand, the

district court believed that there was no reasonable suspicion for the stop, this was error also. As detailed above, the uncontradicted testimony at the suppression hearing was that Agent Vogrinec had received a total of three telephone calls from a confidential informant that he believed reliable; that the informant stated that he or she had direct knowledge of the plan to transport marijuana; that agents began surveillance of the defendant, with whom they were familiar as someone who had previously been convicted of drug trafficking offenses; that they observed the defendant place a license plate upon a vehicle in her driveway, which license plate was registered to a different vehicle owned by someone else; that the agents also observed a truck that had recently crossed the border from Mexico in defendant's driveway; that the agents observed the defendant and a man driving that truck travel to Grants on the day specified by the informant and check into a hotel; that they observed two other vehicles arrive at the hotel during the night; that they observed the defendant meeting with a group of individuals not previously seen with the defendant; and that they then observed the defendant leave the hotel in a different car from that in which she had arrived, followed by the male driving the pickup truck that had crossed the border from Mexico.

The district court made only skeletal oral findings of fact and didn't clearly find the details of Agent Vogrinec's testimony either credible or incredible. Assuming, however, that he didn't disbelieve the uncontradicted testimony of Agent Vogrinec, we hold that based on the totality of the circumstances known by the Customs agents at the time of the stop there was a reasonable suspicion of wrongdoing sufficient to warrant an investigative stop.

The next issue is the propriety of the arrest, which, as we have previously noted, the trial court found occurred at the moment that the occupants were ordered from the vehicle. Agent Vogrinec testified that he observed the burlap bags in the hatchback area of the car prior to ordering the occupants out of the vehicle. He also testified that, in his experience, the burlap bags were of the type frequently used to transport marijuana. The district court made no finding of fact as to whether Agent Vogrinec in fact saw the burlap bags before the arrest.

■ While the previously recited observations—if believed by the trial court—when considered in combination with the fact that the blue car was not travelling on the most direct route toward Denver and the fact that agents did not observe anyone actually placing the marijuana in that car would suffice for a *Terry* stop, this evidence quite clearly falls short of probable cause for an arrest. However, the espial of the burlap bags prior to the arrest, in addition to the facts constituting reasonable suspicion for the stop, would rise to the level of probable cause necessary to render the arrest proper. *See, e.g., United States v. Montgomery*, 620 F.2d 753, 760 (10th Cir.) (dark-colored plastic bags), *cert. denied*, 449 U.S. 882, 101 S.Ct. 232, 66 L.Ed.2d 106 (1980); *United States v. Herring*, 582 F.2d 535, 540 (10th Cir.1978) (burlap bags). Whether Agent Vogrinec in fact observed the burlap bags prior to the arrest turns on an issue of credibility that we are not equipped to resolve. We therefore remand this matter to the district court for a finding on this point. If the district court on remand concludes that Agent Vogrinec did see the burlap bags before ordering the occupants out of the vehicle, then there would have been probable cause for the arrest and the Motion to Suppress should be denied. If, on the other hand, the district court concludes that Agent Vogrinec did not see the burlap bags before the arrest, then there was no probable cause for that arrest and there may be grounds for suppressing the evidence on the basis that it was the fruit of that arrest. *See Brown v. Illinois*, 422 U.S. 590, 598, 95 S.Ct. 2254, 2259, 45 L.Ed.2d 416 (1975). The question will then be "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* (citation omitted).

Assuming that the district court finds that Agent Vogrinec did not see the burlap bags prior to ordering the occupants out of the

vehicle, and that there was thus no probable cause for the arrest, the district court must resolve one further issue before granting the Motion to Suppress. That issue concerns Ms. Montoya's standing to contest the legality of the search as the fruit of an illegal arrest.[3] The government argued at the suppression hearing that Ms. Montoya lacked standing to raise the legality of the search as support for her Motion to Suppress and that the Motion should be denied on that ground.[4] (R.Vol. II at 28–29.) The trial court did not directly rule on the issue, and for reasons not at all apparent to us, the government failed to pursue the issue on appeal.

■■■ Fourth Amendment rights are personal and may not be asserted vicariously. Consequently, suppression of evidence is an appropriate remedy only when the search itself has violated a person's rights; "it is not enough that a person is aggrieved by the introduction of damaging evidence derived from the search." *United States v. Skowronski*, 827 F.2d 1414, 1417 (10th Cir.1987) (citing *Alderman v. United States*, 394 U.S. 165, 171–72, 89 S.Ct. 961, 965–66, 22 L.Ed.2d 176 (1969)). Whether evidence sought to be introduced was obtained in violation of someone else's Fourth Amendment rights is immaterial. *United States v. Arango*, 912 F.2d 441, 445 (10th Cir.1990), *cert. denied*, 499 U.S. 924, 111 S.Ct. 1318, 113 L.Ed.2d 251 (1991). The proponent of a motion to suppress evidence in a criminal case has the burden of "adducing facts at the suppression hearing indicating that [her] own rights were violated by the challenged search." *Skow-*

ronski, 827 F.2d at 1417 (citing *Rakas v. Illinois*, 439 U.S. 128, 130–31 n. 1, 99 S.Ct. 421, 423–24 n. 1, 58 L.Ed.2d 387 (1978)).

■■■ In determining whether a search has infringed upon a person's Fourth Amendment rights, the court must consider two primary factors: whether the defendant has manifested a subjective expectation of privacy in the object of the challenged search and whether society is willing to recognize that expectation as reasonable. *California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 1811–12, 90 L.Ed.2d 210 (1986); *Arango*, 912 F.2d at 445. It is beyond dispute that Ms. Montoya does not have standing to challenge the search of the vehicle merely because she was a passenger in the car or because she was charged with a possessory crime. *See United States v. McKneely*, 6 F.3d 1447, 1450 (10th Cir.1993). The Supreme Court has made clear that a passenger *qua* passenger has no reasonable expectation of privacy in a car in which she claims neither a property nor a possessory interest. *Rakas*, 439 U.S. at 148–49, 99 S.Ct. at 432–33; *United States v. Jefferson*, 925 F.2d 1242, 1249 (10th Cir.), *cert. denied*, ── U.S. ──, 112 S.Ct. 238, 116 L.Ed.2d 194 (1991). Moreover, a person "has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. A car has little capacity for escaping public scrutiny." *New York v. Class*, 475 U.S. 106, 112–13, 106 S.Ct. 960, 965, 89 L.Ed.2d 81

3. The term "standing," while commonly used to refer to a defendant's right to challenge a search under the Fourth Amendment, is not to be understood as distinct from the merits of a defendant's Fourth Amendment claim. *Rakas v. Illinois*, 439 U.S. 128, 138–39, 99 S.Ct. 421, 427–28, 58 L.Ed.2d 387 (1979). We use the term "standing" to refer to the determination of whether a defendant's Fourth Amendment rights have been violated, and not in its traditional sense as a constitutionally- or prudentially-based jurisdictional bar. We realize that the record in this case is not "virtually barren" of facts useful to the determination of this issue, *cf. Combs v. United States*, 408 U.S. 224, 227, 92 S.Ct. 2284, 2286, 33 L.Ed.2d 308 (1972); *United States v. Skowronski*, 827 F.2d 1414, 1418 n. 2 (10th Cir.1987), and that we could therefore resolve the matter ourselves. However, in light of the possibility that the district court might find that Agent Vo-

grinec did see the marijuana before ordering the occupants out of the vehicle, which would establish probable cause for the arrest and would therefore moot the issue of Ms. Montoya's standing to contest the search, we believe remand is proper in this case.

4. Ms. Montoya responded that *United States v. Erwin*, 875 F.2d 268 (10th Cir.1989), provided for standing to challenge the stop of their vehicle, (R.Vol. II at 29), and that since the stop was illegal, the search was illegal as well. In light of our holding that there was reasonable suspicion justifying the stop of the vehicle in which Ms. Montoya was travelling, Ms. Montoya's reliance on the *Erwin* case is misplaced to the extent that it turns on the stop as opposed to the arrest upon exiting the automobile.

(1986).[5] On the other hand, we do not rule out the possibility that a passenger may have standing to challenge the search of a car. A passenger may establish standing by, *inter alia*, demonstrating some relationship to the vehicle sufficient to establish her lawful possession or control thereof. *See Rakas*, 439 U.S. at 143–44 n. 12, 99 S.Ct. at 430–31 n. 12; *United States v. Erickson*, 732 F.2d 788, 790 (10th Cir.1984).

Thus, unless the district court on remand determines that Ms. Montoya adduced evidence at the suppression hearing sufficient to establish her subjectively and objectively reasonable expectation of privacy in the car, other than in her capacity as a passenger, Ms. Montoya will lack standing to challenge the search of the car. We express no opinion on this issue.

The district court's order granting Ms. Montoya's Motion to Suppress is VACATED, and the matter is REMANDED for further proceedings consistent with this opinion.

---

**5.** This is especially true where, as here, the car is a hatchback and the contraband was at least partially in plain view from the outside of the vehicle.